# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**RITA DRURY,**

                Plaintiff,

                                          **Case No. 05-C-956**

    -vs-

**ALLEN E. SCHOESSOW,
CITY OF MILWAUKEE HOUSING AUTHORITY, and
CITY OF MILWAUKEE**

                Defendants.

## DECISION AND ORDER

The plaintiff, Rita Drury ("Drury"), is a former employee of the Public Safety Department of the Housing Authority of the City of Milwaukee ("HACM"). HACM terminated Drury's employment on October 4, 2004. Drury alleges claims under Title VII, the Equal Protection Clause by virtue of 42 U.S.C. § 1983, and the Americans with Disabilities Act ("ADA"). The defendants moved for summary judgment. For the reasons that follow, defendants' motion is granted and this matter is dismissed in its entirety.

## BACKGROUND

HACM was established in 1944 by virtue of a resolution of the Common Council of the City of Milwaukee. HACM is involved in the day-to-day operation of approximately 4,400 units of lower-end public housing and also administers in excess of 5,200 vouchers under a federally funded rent assistance program. HACM does not receive any funds through the City's budget. The City has no involvement in the establishment of the budget

of HACM. HACM has its own compensation and benefit system for its approximately 160 "direct hire" employees. Pursuant to a cooperation agreement, HACM receives services from approximately 140 City employees.

Drury was hired by HACM in April 1992 as a Public Safety Officer, servicing public housing residents in the City of Milwaukee. She was promoted to Lieutenant in 1997. While Drury was employed by HACM, she reported to four different Chiefs of Public Safety: Ronald Johnson (1992 to 1995), Donald Werra (1997-2001), Ken Mueller (2002-2003), and Defendant Allen Schoessow ("Schoessow") (July 2003-).

## I.     Initial performance issues

In 2001, Susan July ("July"), Managing Director of Economic Development and Resident Services, began receiving complaints that Drury was frequently belligerent, angry, difficult to work with, "short fused," "moody" and engaged in "lots of swearing" and "crying jags." These complaints came from co-workers and management staff.

Acting Chief Joseph Lagerman ("Lagerman") was one of the individuals who complained to July about Drury's conduct. Lagerman noted Drury's inability to accept any constructive criticism, coaching or mentoring. Between August 2001 and January 1, 2002, Drury challenged virtually everything Chief Lagerman said during staff meetings. July felt Drury's conduct was insubordinate and intended to undermine Lagerman's authority. When Drury's behavior at staff meetings did not improve over time, July was forced on several occasions to reprimand Drury. Drury continued her attacks despite the reprimands.

During the same time, Drury frequently complained to July about HACM's public safety dispatchers. At that time, the dispatchers were supervised by Angel Rodriguez ("Rodriguez"), so July instructed Drury to talk to Rodriguez so he could resolve her complaints. Drury told July that she disliked Rodriguez, so she refused to speak to him about the matter. Instead, Drury communicated her complaints about the dispatchers to a variety of lower-level employees. Because of this lack of discretion, the dispatchers learned of Drury's criticisms second-hand. July learned that Drury alienated most of the dispatchers, making an effective working relationship impossible because of her criticism.

Sometime in 2001, HACM's federal grant from HUD was eliminated, and HACM acquired a Homeland Security grant. As a result, the Public Safety Program was reorganized to meet additional duties and responsibilities set forth by the terms of the new grant agreement. Chief Mueller determined allocation of the additional duties and responsibilities required to fulfill the terms of the Homeland Security Grant.

Drury complained about the additional duties, which included strict documentation, goal accomplishment and responsibility for specific outcomes. She also made the same complaints about Chief Mueller that she had made about Acting Chief Lagerman – that he was too demanding and too critical of her work. Drury was critical of Chief Mueller and his management style, stating that he was too "academic" and "intellectual."

Over the course of Drury's time at HACM, the Public Safety program continued to grow in terms of responsibilities and complexity of work. For example, a 24-hour dispatch center was created and dispatch functions were computerized. The Public Safety Program

-3-

assumed sole responsibility for all HACM's camera surveillance and card access equipment, both of which were computer-dependent.

Drury resisted computerization. She was unable to manage a camera surveillance system installed at the Parklawn Housing Development which provided real time surveillance within the dispatch center. Although training on the new system was provided to all members of the Public Safety Program, Drury was not able to master the system. During the summer of 2003, floor-to-ceiling windows at the Central City Cyberschool located on site at Parklawn were broken. Drury was unable to use the cameras or direct staff in the use of the cameras to retrieve photos of the vandals.

In 2001 and 2002, Christmas party organizers formed a "Yankee swap," which involved staff members bringing either gag gifts or traditional gifts at random. During the 2001 Yankee swap, July had to leave the party early and the present she received was swapped for a gag gift. Drury became livid. Her anger was so inappropriate and excessive that intake manager Mary Falek commented on Drury's temper tantrum, and the Yankee swap was discontinued.

Drury also engaged in a campaign of criticism against Irene Smith ("Smith"), accusing her of taking leftover food home to her family instead of leaving it for second and third shift staff members, and of pocketing money given to her to fund parties. Smith is a severely disabled employee with significant facial disfigurement including the loss of an ear due to cancer.

## II.  Interactions with Chief Schoessow

In the summer of 2002, Acting Chief Lagerman asked defendant Allen Schoessow to verify reports of Drury's poor behavior. Drury found out about this and called July at home, stating "Al [Schoessow] just showed me his true colors. I can't trust him anymore."

Subsequently, Lagerman spoke to Drury about her misconduct as documented by Schoessow. Drury then confronted Schoessow in an open work area. Drury yelled and screamed at Schoessow in the presence of others, accusing him of going behind her back and trying to get her into trouble. Drury also used profane, vulgar and inappropriate language during this tirade. July viewed this as further deterioration of Drury's ability to exercise sound judgment.

Schoessow was appointed Chief in July, 2003. With the exception of Drury, Public Safety staff were enthusiastic about the appointment. Soon after he became Chief, Schoessow consulted Drury about moving a public safety officer from first to second shift. Drury stated that she agreed with the change, but then began openly questioning Schoessow's capabilities and criticizing his work performance.

July and Chief Schoessow met with Drury to talk about Drury's poor attitude towards Schoessow. Drury was defensive, stating "I don't know why you're picking on me. You don't like me." Drury stated that she was going to cry and abruptly left the meeting.

## III.  Drury passed-over for Captain position

In December 2003, Chief Schoessow created two "captain" positions for first and second shift. Captains held positions of trust and were expected to supervise all aspects of

the Program and communicate effectively with Chief Schoessow about any issues that warranted the Chief's attention. Drury was not considered for a captain position. Chief Schoessow felt that Drury's open criticism, inability to get along with others, questionable judgment, and lack of ability to master computer equipment and learn new skills disqualified her for a captain position.

On December 3, 2003, Drury received her yearly performance appraisal. While her performance met or exceeded expectations in five categories, the evaluation also noted her deficient supervisory skills: "Lt. Drury could be a more effective supervisor. Lt. Drury has trouble when it comes to matters of discipline with subordinates." (Defendant's Response to Plaintiff's Proposed Findings of Fact, ¶ 57). The evaluation also noted that Drury "showed a lack of confidence in her abilities" and that "Lt. Drury needs to recognize her role as a supervisor when dealing with her subordinates. If she notices a matter that needs correction, she should tend to it. Whether it is a matter of teaching the subordinate so the correction is satisfied or documenting the proper paper work for disciplinary action." (*Id.*) Chief Schoessow prepared a more negative evaluation, but because it appeared that Drury was having a crisis of confidence about her drug investigation duties, he created a more positive evaluation to boost her confidence. (*Id.*)

Ultimately, Rodriguez and Cordell Ray ("Ray") filled the open captain positions. Chief Schoessow worked closely with Rodriguez and felt he would be a good supervisor because he worked well with the dispatchers, displayed exceptional computer and technical skills, and was bilingual. Ray, who was offered the job because a previous choice declined,

-6-

had a master's degree and was well-respected by staff members. Additionally, Ray had family connections within the Milwaukee Police Department, an important link to an agency the HACM worked with on a regular basis.

On January 5, 2004, while Drury was absent from work on medical leave, July advised Drury by telephone that Rodriguez and Ray were promoted to captain ahead of Drury. July also informed Drury that Drury would be taking over the first-shift lead drug enforcement position. Drury hung up the phone, but later called back. Drury was furious and complained about having more tenure than Ray.

Drury did not tell July that she believed the promotion decisions were discriminatory. On January 13, 2004, Drury wrote a letter to July regarding her unfair treatment. However, the letter does not mention discrimination and does not complain about the promotion decisions. (Defendant's Response to PPFF, ¶ 68).

After she did not get the promotion to captain, Drury's work performance declined at a dramatic rate. Under the Homeland Security grant, all staff members were required to attend First Aid and First Responder training. Drury complained that the classes were stupid and proceeded to fail almost every test. After some time, she finally managed to pass the final certification test.

**IV. Drury's five-day suspension**

Drury was unable to perform her duties as drug officer without constant supervision from Chief Schoessow. Drury expressed reservations about her abilities to carry out the drug investigation duties and did not believe she could adequately perform the job. While

-7-

Schoessow told Drury that she was doing a good job, she needed constant supervision because of her lack of confidence in her own abilities to work independently. Drury frequently called the Chief at home with questions and problems. (Defendant's Response to PPFF, ¶ 81).

Two additional incidents resulted in the imposition of a five-day suspension without pay. On May 7, 2004, Drury instructed the person in charge of time cards to switch sick time for flex time, despite Chief Schoessow's instructions to the contrary. Drury changed her leave request after her supervisors signed off on her time card. By doing so, Drury suggested that Chief Schoessow actually approved the change. Chief Schoessow and Captain Rodriguez viewed this as fraud. Drury received a written reprimand for her behavior.

In the second incident, Drury was sent to an apartment in response to a resident's attempted suicide. Without permission from the resident or police, Drury removed the resident's pills and took them to a pharmacy for identification. Drury told the pharmacist that the resident bought the drugs from another resident. Drury then threatened the alleged seller, telling this resident that she would be "charged" if her neighbor died. However, Drury had no proof that the medication was procured illegally. She did not know what the medication was for, and may have actually taken medication the suicidal resident needed for a serious medical condition. Threatening the neighbor with criminal prosecution exceeded Drury's authority and indicated poor judgment.

After her suspension, Chief Schoessow decided to transfer Drury to third shift, hoping that less contact with residents would result in fewer opportunities for the same kind of

-8-

misconduct. Chief Schoessow told Drury about the shift transfer on June 27, 2004. Drury told Chief Schoessow that she would not accept the transfer, and she stormed out of his office. Tom Schneider ("Schneider"), another I-Team member, saw Drury's dramatic exit and followed her, believing there was a crisis at one of the housing developments. Mr. Schneider followed Drury's squad car to Hillside, noting that her driving was reckless. When he arrived at Hillside, he heard Drury on the phone screaming, "The fuckers can't make me go to third shift. I ain't going." Schneider withdrew and reported Drury's behavior to Captain Rodriguez.

### V.     **Drury loses her driver's license and is terminated**

On June 29, 2004, Drury informed HACM that she going on indefinite sick leave. While Drury was on leave, HACM discovered that Drury was arrested for operating a vehicle while intoxicated on June 28, 2004. Accordingly, Drury was forced to surrender her driver's license. Holding a valid driver's license is one of the requirements of Drury's position, since she was responsible for traveling to various housing developments throughout the city and to be available if needed to do so on a 24-hour basis. Drury was required to advise the Chief that she surrendered her license, but she failed to do so.

On August 24, 2004, Drury attended a pre-discharge disciplinary hearing regarding her arrest and license suspension. As a result of that hearing, HACM lifted Drury's suspension status because Drury still had operating privileges, pending the outcome of a September 9, 2004 court hearing.

During a September 22, 2004 pre-termination hearing, Drury presented evidence that she could still drive pursuant to an occupational license. However, Drury was advised that her occupational license was insufficient because she was limited in the hours during which she could drive. Although her shift ran from 11:00 p.m. to 7:00 a.m., her occupational license did not allow her to drive during these hours.

After the September 22 hearing, Perez ordered Drury's termination for inability to perform the essential functions of being available to perform a HACM vehicle on a 24-hour emergency basis. Drury acknowledged that she was terminated because of her inability to perform this essential function:

> Q. ...I appreciate that you think it was unfair and unfounded, but you would agree with me that you have no information indicating that it was because of your gender or because you filed a discrimination complaint or because you claimed that you had a disability, right?
>
> A. For the actual termination, it was because of, as I read it right, not having a driver's license, that's correct, ma'am.

Defendant's Proposed Findings of Fact, ¶ 191.

## ANALYSIS

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence

-10-

of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

**I.     Termination**

Drury has no direct evidence that she was terminated for a discriminatory reason. *See Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003) (citing *Walker v. Glickman*, 241 F.3d 884, 888 (7th Cir. 2001)) (Direct evidence of discrimination is evidence that, "if believed by the trier of fact would prove [discrimination] 'without reliance on inference or presumption'"). Instead, Drury relies on circumstantial evidence. Circumstantial evidence can be used to "infer intentional discrimination by the decision-maker." *Rogers*, 320 F.3d at 753. The most common type of such evidence consists of "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). Taken separately or in combination, circumstantial evidence can compose a "convincing mosaic of discrimination against the plaintiff." *Id.* at 737.

Drury was terminated because she lost her driver's license. While Drury was able to secure an occupational license, her job required her to be able to legally operate a vehicle 24-hours a day, 7-days a week, and her occupational license did not allow her to do this. Drury offers no evidence which demonstrates or even suggests that the lack of a valid driver's license was a pretext for discrimination. In fact, she admitted that the loss of her driver's license was the reason for her termination.

-11-

Drury argues that she was terminated because of her disability in violation of the ADA. In support, Drury points out that she was terminated only after she left work on medical leave for depression and anxiety. Putting aside the question of whether Drury is a qualified individual with a disability, Drury provides no direct or circumstantial evidence linking her termination to her medical condition. Drury argues that the timing was suspicious, but Drury took medical leave on June 29 and wasn't terminated until October 4 – a three month gap.

More telling, Drury's termination is not suspicious in relation to her medical leave because her license suspension, which occurred after she left on medical leave, was the true intervening cause of her termination. *See, e.g., Hite v. Biomet, Inc.*, 38 F. Supp. 2d 720, 743 (N.D. Ind. 1999) ("Here, however, a little over two months passed and an intervening event occurred, *i.e.* Hite's failure to report to work, before she was terminated. This is not the type of 'telling' temporal sequence which permits Hite to establish a causal connection between her FMLA leave and her termination"); *Mack v. County of Cook*, 827 F. Supp. 1381, 1387 (N.D. Ill. 1993) ("This intervening breach of her employment duties renders the temporal period between the EEOC complaint and her termination insufficient to infer a causal connection between the two events"). The same logic defeats Drury's argument that her termination was in retaliation for complaining about not being promoted (in January 2004) – or, for that matter, that it was in retaliation for any other alleged protected activities.

## II. Failure to promote

Drury argues that she was passed-over for the captain position because of her gender. To establish a *prima facie* case of gender discrimination under the indirect method, Drury must prove the following elements: (1) she is a member of a protected class; (2) she was qualified for the promotion; (3) she did not receive the promotion despite her qualifications; and (4) a person not in the protected class was promoted instead. *See Emmel v. Coca-Cola Bottling Co.*, 95 F.3d 627, 629 (7th Cir. 1996). If Drury establishes a *prima facie* case, the burden shifts to the defendant employer to offer a legitimate, non-discriminatory reason for the termination. *See Paul v. Theda Med. Ctr., Inc.*, 465 F.3d 790, 793 (7th Cir. 2006). If the defendant makes this showing, the burden then shifts back to the plaintiff to demonstrate that the defendant's proffered reason is pretextual. *Id.*

Drury cannot meet her *prima facie* burden because she was not qualified for the promotion. It is undisputed that Drury had difficulty managing and supervising other workers, an essential requirement for the Captain position. Moreover, her constant clashes with management in general – and Chief Schoessow in particular – demonstrate that she was not qualified to fill a position of trust with respect to the Chief.

Even if Drury could meet her *prima facie* burden, the reasons that Drury was passed over for this promotion – that she was too volatile and unstable to occupy a position of trust and discretion – are legitimate, non-discriminatory justifications. Essentially, Drury argues that the two individuals promoted ahead of her – both males – were not as qualified for the position as she was. This is a tepid argument to make, for the obvious and oft-cited reason

-13-

that the Court does not sit as a "superpersonnel department" where "disappointed applicants or employees can have the merits of an employer's decision replayed to determine best business practices." *Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005). An employer is "free to develop its own criteria in determining whom to promote." *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 733 (7th Cir. 2001).

To establish pretext in this context, Drury must establish that she was "so clearly superior to the finalists chosen that *no reasonable person exercising impartial judgment could have made the same decision*" that the employer made. *Holmes v. Potter*, 384 F.3d 356, 362 (7th Cir. 2004) (emphasis added) (citation omitted). Drury falls back on her seniority, but seniority alone is not enough, especially in light of the particular qualifications of those promoted ahead of her (bilingual, connections in the MPD). Drury notes that she received generally positive performance evaluations, but some of those same evaluations also questioned her leadership and managerial skills. In sum, the evidence before the Court fails to demonstrate that Drury was clearly superior to those promoted to the captain position in January 2004.

## III. Retaliation

To state a successful claim for retaliation, Drury must prove that she engaged in statutorily protected activity. *See Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007) (listing elements of claim under direct method); *Brewer v. Board of Trustees of Univ. of Ill.*, 479 F.3d 908, 915 (7th Cir. 2007) (listing elements under indirect method). As protected activity, Drury points to her complaints to July after she was denied the promotion

to captain, particularly a memo she wrote on January 13, 2004 (characterized as a "you done me wrong" memo). (PPFF, ¶¶ 62, 63, 68-79).[1] However, none of these communications in general, or the memo in particular, referenced gender or complained that the employment decisions were in any way discriminatory. (*Id.*; Defendant's Response to PPFF, ¶¶ 63, 68).

In this respect, although an employee need not use the magic words "sex" or "gender discrimination" to bring her speech within Title VII's retaliation protections, "she has to at least say something to indicate that her gender is an issue. An employee can honestly believe she is the object of discrimination, but if she never mentions it, a claim of retaliation is not implicated, for an employer cannot retaliate when it is unaware of any complaint." *Miller v. Am. Family Mut. Ins. Co.,* 203 F.3d 997, 1008 (7th Cir. 2000) (emphasis added). Therefore, Drury's "you done me wrong memo" and her oral complaints to July are not statutorily protected activities. *See, e.g., Hamm v. Weyauwega Milk Prods., Inc.*, 332 F.3d 1058, 1066 (7th Cir. 2003) (rejecting retaliation claim where the employee complained because she felt picked on, not that she was discriminated against because of her sex or gender, which is what Title VII requires).

Drury claims in her affidavit that she was "upset when July told her that two men were being promoted" and "complained that it was unfair because these men had less seniority and experience than she did." (PPFF, ¶ 63). This self-serving statement does not create an issue

---

[1]While the Seventh Circuit has yet to rule on the issue, courts generally agree that informal complaints to supervisors constitute protected activity under Title VII's retaliation provisions. *See Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 508 (7th Cir. 2004) (declining to resolve whether informal complaint to supervisor constitutes protected activity); *Kruger v. Principi*, 420 F. Supp. 2d 896, 910 (N.D. Ill. 2006) (informal complaints to supervisor may constitute protected activity); *Damato v. Jack Phelan Chevrolet Geo, Inc.*, 927 F. Supp. 283, 288 (N.D. Ill. 1996) (same).

of fact with regard to protected activity. Drury's statement here is equivocal and does not explicitly state whether she complained that the promotion decisions were discriminatory. At most, the affidavit indicates that her complaints (if any) were about seniority and experience, not gender. Moreover, the veracity of Drury's affidavit is questionable, as it contradicts her earlier deposition testimony that she *did not* reference gender discrimination in her complaints to management in January 2004. (Compare PPFF, ¶ 63 and Docket No. 49, Ford Aff. Exhibit C, Drury Dep. 121-128). *See, e.g., Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168-69 (7th Cir. 1996) (courts do not countenance the use of sham affidavits, which contradict prior sworn testimony, to defeat summary judgment).

The only evidence suggesting that Drury actually engaged in protected expression is an oral complaint to DCD Personnel Officer Bonnie Vaughn. (Docket No. 41, Drury Aff. ¶ 55). However, Drury waives any argument in this regard because this statement is not in her proposed findings of fact and she does not properly pursue the argument in her briefs. *See Schoenfield v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001) (finding arguments not raised before the trial court waived). Instead, Drury lumps this communication together with her memo and other communications to July in January 2004. Moreover, there is no evidence suggesting a causal link between Drury's complaint to Vaughn and any adverse employment actions. *See Kampmier*, 472 F.3d at 939 (under the direct method, plaintiff must show a causal link between the protected expression and the adverse action taken by the employer).[2]

---

[2] While Drury references the indirect method for proving her retaliation claim, this avenue is unavailable to her because she "cannot prove that a similarly situated employee who did oppose the employee's practice was not fired or otherwise treated as badly as the plaintiff was." *Sylvester v. SOS Children's Villages Ill. Inc.*, 453 F.3d 900, 902 (7th Cir. 2006).

-16-

## IV. ADA

To state a *prima facie* case of disability discrimination, Drury must demonstrate that she is (1) disabled within the meaning of the ADA; (2) qualified to perform the essential functions of the job with or without accommodation; and (3) has suffered an adverse employment action because of her disability. *See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004). As noted above, Drury provides no evidence establishing a link between her termination and her alleged disability. Moreover, Drury was not a qualified individual with a disability when she lost 24-hour driving privileges, an essential function of the job with no apparent or proposed accommodation. Therefore, Drury cannot establish a prima facie case of discrimination under the ADA.

## V. Section 1983

Drury alleges that the failure to promote her to captain was an equal protection violation based on her gender. The elements of such a claim are similar if not identical to a straightforward discrimination claim under Title VII. *See, e.g., McPhaul v. Bd. of Com'rs of Madison Cty*, 226 F.3d 558, 564-65 (7th Cir. 2000) (listing elements of equal protection claim); *Williams v. Seniff*, 342 F.3d 774, 788 n.13 (7th Cir. 2003) (same standards for proving intentional discrimination apply to Title VII and § 1983 equal protection). As noted above, the evidence provided by Drury cannot withstand summary judgment on her gender discrimination claim. Therefore, her equal protection claim must also be dismissed.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

1. The defendants' motion for summary judgment [Docket No. 32] is **GRANTED**; and

2. This matter is **DISMISSED** in its entirety.

Dated at Milwaukee, Wisconsin, this 8th day of August, 2007.

                                        **SO ORDERED,**

                                        **s/ Rudolph T. Randa**
                                        **HON. RUDOLPH T. RANDA**
                                        **Chief Judge**